IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

PATRICK MICHAEL COLLINS,

    Plaintiff,

v.

DEKALB COUNTY, GA,

    Defendant.

Civil Action No.

1:24-cv-01252-LMM-CMS

## BRIEF IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

As required by Local Rule 7.1(A)(1), Defendant DEKALB COUNTY, GA submits this brief in support of its Motion for Summary Judgment.

## I.   INTRODUCTION

This is an Americans with Disabilities Act ("ADA") case. Like many people, Plaintiff found he enjoyed working from home during the COVID-19 pandemic. When Defendant began to emerge from the pandemic and resume its normal in-person operations, Plaintiff only then began asserting that he suffered from a medical need that required 100% remote work. Defendant immediately engaged Plaintiff in the interactive process, and after laboring to obtain information from Plaintiff's medical providers, Defendant offered Plaintiff an alternative accommodation of a

- 1 -

private, secluded office. But Plaintiff was not interested in anything other than his preferred accommodation of 100% remote work, and rejected any alternative accommodations out of hand. Ultimately, Defendant determined that Plaintiff was unable to perform the essential functions of his job while working 100% from home, and Plaintiff was terminated.

This Court should dismiss all four of Plaintiff's claims in this case. Plaintiff's failure to accommodate and discrimination claims fail because: (1) Plaintiff's inability to work anywhere but home prevents him from performing the essential function of his job, (2) Plaintiff failed to produce medical evidence showing he suffers from any functional impairments, and (3) Plaintiff's failure to consider anything other than 100% remote work caused a breakdown in the interactive process. Plaintiff's interference and retaliation claims also fail because Plaintiff was terminated solely for his unwillingness to be physically present at the office and on job sites, which are essential functions of Plaintiff's job.

## II.    STATEMENT OF BACKGROUND FACTS

### A. <u>October 2019 – March 2020: Plaintiff is Hired as a Plans Examiner</u>

In October 2019, Plaintiff Patrick Michael Collins ("Plaintiff") was hired by Defendant to work as a Building and Fire Plans Examiner in the Fire Rescue Department, as well as the Planning and Sustainability Department. <u>Defendant's Statement of Material Facts ("SMF")</u> at ¶ 1. The plans examiner role involves a

number of technical duties, such as reviewing plans submitted by builders, architects, and engineers for compliance with "structural and non-structural requirements" imposed by various different building codes. Job Description at p. 1, Ex. A; Plaintiff Dep. at p. 111: 1-7. Critically to this case, fulfilling these technical duties often requires plans examiners to meet as a team to discuss issues of code interpretation, and occasionally, plans examiners are required to go into the field to attend site inspections and assist inspectors and supervisors in resolving "field review questions." Job Description at p. 2, Ex. A; Plaintiff Dep. at p. 115:13-19; Labbe Dep. at p. 22:1-19, 39:2-25; McMurray Dep. at p. 29:11-20; Site Visits, Ex. H. These site visits allow the plans examiner to understand the facts as they exist on the ground, and assess code compliance issues that may not be apparent from looking solely at paper or digital building plans. Labbe Dep. at p. 39:2-25, 40:1-17; McMurray Dep. at p. 105:16-25, 106:1-6; Fullum Dep. at p. 40:10-16, 41:6-12. Beyond their technical expertise, plans examiners are also expected to provide customer service to the entities submitting plans for review by meeting and conferring with these entities to answer questions of code interpretation. Job Description at p. 2 Ex. A; Labbe Dep. at p. 26:12-25, 93:14-21; McMurray Dep. at p. 66:4-13.

4933-1730-8257, v. 2

When he applied to work for Defendant, Plaintiff did not say he had a disability that required him to work remotely, and Plaintiff worked in person for several months without issue. SMF at ¶ 2.

**B. March 20, 2020: COVID Begins and Plaintiff Starts Remote Work**

In light of the COVID-19 pandemic, DeKalb County directed many of its employees, including Plaintiff, to begin working from home in March 2020. COVID Remote Work Emails, Ex. B. Plaintiff first began working remotely Friday, March 20, 2020, when the COVID-19 pandemic began. SMF at ¶ 3.

**C. April – May 2020: Plaintiff Receives Dr. Cantor's Evaluation, But Does Not Request Any Accommodation**

On April 27, 2020, Dr. David S. Cantor issued an evaluation finding that Plaintiff was "functioning in the average range of intellectual ability" and indicating that Plaintiff's test results "do not indicate impaired attention regulation or response control." Id. at ¶ 4. Dr. Cantor noted that scans of Plaintiff's brain showed "symmetric delta excess," which suggested a possibility of future cognitive decline. Cantor 2020 Evaluation at p. 26, Ex. D. However, Dr. Cantor consistently made clear to Plaintiff during each of his visits that this "delta excess" could not, itself, serve as the basis for diagnosing Plaintiff with any cognitive disorders. Cantor Collins Phone Call Transcripts at p. 3–4, Ex. E.

In May 2020, Plaintiff sent an excerpt of Dr. Cantor's report to Karen Williams, a management analyst with Fire Rescue, and Vanessa Buchanan, an

administrative assistant with the Planning and Sustainability Department, and asked them to "put it in his file." Collins Email to Williams and Buchanan, Ex. F. Plaintiff did not ask for any accommodation in his message to Williams and Buchanan. Id. Furthermore, Dr. Cantor's evaluation did not indicate Plaintiff needed to work remotely, but rather indicated that "[a] separate workspace with a door would be helpful" for Plaintiff, showing that Plaintiff was capable of working in an office environment. SMF at ¶ 5.

### D. April 2021 – 2022: Plaintiff Makes Repeated Attempts to Avoid Reporting In Person, Repeatedly Citing Non-Disability Related Reasons

On multiple occasions, the Planning and Services Department asked Plaintiff to participate in a rotating in-office schedule. Return to Work Emails (2020–2021), Ex. G; Return to Work Emails (2022), Ex. I. Plaintiff repeatedly asked permission to be excused from these requirements for non-disability related reasons, such as the lack of a workstation or personal family crisis.[1] Return to Work Emails (2020–2021) at p. 5, 7–8, 14, 18–19, Ex. G; Return to Work Emails (2022) at p. 1, 6 Ex. I. Plaintiff asked that these requests be granted as a matter of grace, and indicated that he would appreciate "the continued courtesy of working 100% remotely." Return to Work Emails (2022) at p. 4, Ex. I. Plaintiff also objected to being directed to work in person

---

[1] After offering excuses about not having a workstation, Plaintiff did once mention that "HR has on record…my certified disability of ADHD," but Plaintiff subsequently showed up to work the following day without objection. (Return to Work Emails (2020–2021) at p.6–8, Ex. G.

by Planning and Sustainability leadership because he was "employed by [the Fire Marshal's Office]" and stated that "Robert Armstrong and Rodney Miller…were never [his] supervisors, even in their own words." Id.

E. **September 2022 – January 2023: Chief McMurray Advises Staff that Remote Work is Ending; Plaintiff Begins Seeking an Accommodation**

In September 2022, Chief Treymane McMurray joined the DeKalb Fire Rescue Department as the Deputy Chief of Planning and Risk Reduction. McMurray Dep. at 12:22-25, 13:1-6. On December 6, 2022, Chief McMurray informed his division, including Plaintiff, that "flex schedules for everyone except the Admins will end on January 7, 2023" and that "[a]ll remote days requested will be considered on a case-by-case basis." SMF at ¶ 8.

In December 2022, Plaintiff met with Chief McMurray and indicated for the first time that he needed to work from home for medical reasons. Id. at ¶ 9. Plaintiff also informed Chief McMurray that he sent paperwork to Karen Williams in 2020. McMurray Dep. at p. 23:7-25, 43:11-21. Chief McMurray reached out to Karen Williams and obtained the excerpts from Dr. Cantor's 2020 evaluation. McMurray, Smith, and Grant Emails (Dec 22 – Jan 23) at p. 1, 4–5, Ex. K. On January 5, 2023, Chief McMurray forwarded the documents he received from Williams to Monica Smith, the Administrative Support Manager and HR liaison for Fire Rescue. Id. at 7. On January 9, 2023, Smith provided Plaintiff with forms for filling out an accommodation request. SMF at ¶ 10.

## F. **January 2023 – May 2023: Defendant Attempts to Find an Accommodation for Plaintiff Without Eliminating Essential Functions**

On January 31, 2023, Plaintiff emailed Smith his first attempt at completing an accommodation request form. Accommodation Request Forms at p. 1–3, Ex. T. On February 7, 2023, Smith directed Plaintiff to contact Dominique Grant, as he would be responsible for handling Plaintiff's accommodation request going forward. Grant, Smith, and Collins Emails (Jan –May 2023) at p. 9, Ex. L.

On April 7, 2023, Plaintiff notified Grant that Dr. Cantor was unwilling to fill out an accommodation request on Plaintiff's behalf "because he doesn't have re[c]ent data." SMF at ¶ 11. Plaintiff provided a letter from Dr. Cantor's office manager, and indicated that he would provide an updated report from Dr. Cantor once he completed additional testing. Cantor 2023 Records at p. 1, Ex. M. On April 10, 2023, Grant informed Plaintiff that the letter from Dr. Cantor's office manager did not provide sufficient information to proceed with the accommodation process, and directed Plaintiff to have a medical provider complete a Healthcare Certification Form. Grant, Smith, and Collins Emails (Jan–May 2023) at p. 7, Ex. L.

When Dr. Cantor was unwilling to advocate for Plaintiff's requested accommodation, Plaintiff reported to PPG Care Centers on April 26, 2023. SMF at ¶ 13. Plaintiff had not been treated at the PPG Care Centers for four years, and this was his first time receiving treatment from Paige McBryar, a nurse practitioner from that office. McBryar Treatment Notes at p. 9–12, Ex. N; McBryar Healthcare

Certification Forms at p. 5, 9, Ex. O. After a single visit, McBryar filed out a Healthcare Certification Form on Plaintiff's behalf, indicating that Plaintiff worked well in a "quiet, controlled environment." SMF at ¶ 13. Plaintiff sent McBryar's first Certification Form to Grant on April 26, 2023, but Plaintiff had to obtain a revised version of the Form due to legibility issues. Grant, Smith, and Collins Emails (Jan–May 2023) at p. 5–6, 13, Ex. L. While he attempted to obtain a legible version of McBryar's form, Plaintiff provided Grant with records from his visit to Dr. Scott Duncan in November 2019. Id. at p. 13; Duncan Medical Records, Ex. V. Plaintiff stated Dr. Duncan was "now a Forensic Psychiatrist and cannot help [Plaintiff]." Grant, Smith, and Collins Emails (Jan–May 2023) at p. 13, Ex. L.

On May 3, 2023, Grant emailed McBryar's office and expressed his concern that the information provided in McBryar's initial Healthcare Certification Forms suggested that Plaintiff was "unfit to complete the essential functions on his job description," because several of Plaintiff's job requirements are "public facing and have distractions built into them." Grant and McBryar Emails (May – June 2023) at p. 13, Ex. U. Grant provided McBryar with a list of functions from the Building and Fire Plans Examiner Job Description that demonstrated the public facing nature of Plaintiff's job. Id.; Job Description at p. 1–2, Ex. A.

### G. May 2023: Remote Work Officially Ends; Plaintiff Refuses to Attend Work During the Pendency of His Accommodation Request

On April 26, 2023, Fire Chief Darnell Fullum issued a formal declaration, memorializing that remote work would be officially ending for all Fire Rescue Employees on May 1, 2023. <u>Official Return to Work Announcement</u>, Ex. P. When Plaintiff was asked by supervisors to return to work on May 15, 2023, he referred his supervisors to Dominque Grant, suggesting that he had a "Healthcare Certification for Reasonable Accommodation on file." <u>FMLA Leave Emails</u> at p. 4–5, Ex. Q. Grant advised Plaintiff that he was still in the interactive process and had not yet been approved for an accommodation. <u>Id.</u> at p. 1. The next day, Plaintiff filed for Family Medical Leave while his accommodation request was pending. <u>Id.</u> at p. 11.

## H. <u>May 2023 – June 2023: Grant Continues Seeking Information from McBryar</u>

On May 19, 2023, McBryar sent Grant a short letter that did not address the concerns raised by Grant on May 3, but insisted Plaintiff was "fully capable of his current job responsibilities, which he had been performing remotely for approximately 3 years." <u>McBryar Letters</u> at p. 1, Ex. R; <u>Grant and McBryar Emails (May – June 2023)</u> at p. 10, 12–13, Ex. U. On May 20, 2023, Grant emailed McBryar's office and reiterated his request for clarifying information, repeating his concerns that Plaintiff's job included "public facing" job functions that "went undone" during the pandemic due to health and safety concerns. <u>Grant and McBryar Emails (May – June 2023)</u> at p. 9–10, Ex. U.

On June 14, 2023, McBryar sent a new Healthcare Certification Form to Grant, stating that Plaintiff required "a controlled familiar environment." McBryar Healthcare Certification Forms at p. 5–8, Ex. O; Grant and McBryar Emails (May – June 2023) at p. 7, Ex. U. Grant immediately sent another follow up message to McBryar, explaining that McBryar failed to specifically identify which "essential functions" of Plaintiff's job that he required an accommodation for. Grant and McBryar Emails (May – June 2023) at p. 4–5, Ex. U. Grant also noted that McBryar repeatedly used the word "reports" when describing Plaintiff's alleged disabilities, making it impossible to determine whether she had diagnosed Plaintiff with those conditions. Id. On June 23, 2023, McBryar provided a final Healthcare Certification Form, which asserted that Plaintiff required a "controlled familiar environment" to perform his duties. Id. at p. 3; McBryar Healthcare Certification Forms at p. 9–10, Ex. O.

I.  **June 2023 – July 2023: Dr. Cantor Informs Plaintiff He Has No Functional Impairments to His Cognitive Abilities**

On June 21, 2023, Plaintiff called Dr. Cantor to discuss the results from Plaintiff's May 2023 evaluation. Cantor Collins Phone Call Transcripts, Ex. E; Cantor 2023 Records at p. 2–33, Ex. M. During that call, Dr. Cantor told Plaintiff that "all of [his] scores are excellent" and "there is nothing on this battery that says you are impaired." SMF at ¶ 16. Dr. Cantor concluded his summary of findings by informing Plaintiff "***I don't have any diagnosis to give you.***" Cantor Collins Phone

Call Transcripts at p. 5, Ex. E. On July 5, 2023, Plaintiff and Dr. Cantor conferred again, and Dr. Cantor indicated that although Plaintiff's scans still showed abnormal amounts of "delta waves," he still did not "show any significant impairments." SMF at ¶ 17. Appearing to accept Dr. Cantor's opinion, Plaintiff conceded that "***I don't have a disability***." Id. at ¶ 18.

### J. July 11, 2023: Defendant Offers Plaintiff a Personal Office at the Fire Headquarters

On July 11, 2023, Grant informed Plaintiff that he had been granted an alternative accommodation of "a 'Controlled Familiar Environment' in the form of an office." Id. at ¶ 19. While Plaintiff previously had an office, the proposed accommodation was "an office away from noise distractions," and included features such as a door that could shut, no windows, a return vent that functioned as a white noise machine, and no adjoining offices on either side. Id. at ¶ 20.

### K. July 27, 2023: Plaintiff Asks Dr. Cantor to Change Plaintiff's Evaluation Before Providing It to Defendant

Plaintiff called Dr. Cantor to express concerns that Dr. Cantor's evaluation "portrays [him] as an average, if not above average person with no concerns" and failed to "refer to the mapping." Cantor Collins Phone Call Transcripts at p. 38, Ex. E. Dr. Cantor reminded Plaintiff that he could not diagnose Plaintiff with any cognitive disorder based solely on the brain mapping results, and that he has said that "right from the very first test that we did a couple years ago." Id. However, with

Plaintiff's wheedling, Dr. Cantor indicated he was willing to change his findings and offered his personal, non-medical opinion that requiring Plaintiff to work in person was "kind of stupid." Id. at p. 45. Dr. Cantor indicated he was comfortable relying on McBryar's purported findings as a "foundation" for his revised opinion because "she has obviously been working with [Plaintiff] for a while." Id. at p. 47. Plaintiff failed to correct this misunderstanding by Dr. Cantor, and did not inform him that he had only be treating with McBryar since April 2023. Id.

**L. July 2023 – October 2023: Plaintiff Refuses the Accommodation, Does Not Return to Work, and is Terminated**

On July 28, 2023, Plaintiff refused to accept the proposed alternate accommodation of a private office. SMF at ¶ 23. At the time he refused this accommodation, Plaintiff had never set foot in the proposed office at the Fire Headquarters. Id. at ¶ 24. Plaintiff also provided Defendant, for the first time, the 2023 neurological evaluation from Dr. Cantor, including the revised opinion that Dr. Cantor had issued at Plaintiff's urging. Accommodation Emails (July – Aug 2023) at 7–8, Ex. W; Cantor 2023 Records at p. 34–35, Ex. M.

On August 24, 2023, after determining that 100% remote work would require the elimination of essential functions of the plans examiner role, Grant issued a denial of Plaintiff's request for 100% remote work. SMF at ¶ 25. Plaintiff was then given multiple opportunities to report for work, but failed to do so on each occasion. Fullum and Smith Correspondence at p. 1–4, Ex. S. Chief Fullum issued a final

- 12 -

notice of termination on October 30, 2023. Id. at p. 5–6. Plaintiff would be separated "due to [his] inability or unwillingness to perform essential functions of [his] position as a Building and Fire Plans Examiner." Id. at p. 5.

## I.    ARGUMENT AND CITATION OF AUTHORITY

### A. <u>Standard of Consideration</u>

Pursuant to Federal Rule of Civil Procedure 56(a), a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Where, as here, the non-moving party bears the burden of proof at trial, "the moving party may simply point out to the district court that there is an absence of evidence to support the non-moving party's case on the issue in question." <u>Chem-Nuclear Systems, Inc. v. Arivec Chemicals, Inc.</u>, 978 F. Supp. 1105, 1109 (N.D. Ga. 1997).

The court is required to enter summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986). Accordingly, in responding to a properly supported motion for summary judgment, if a party fails to properly address an assertion of fact, the court may consider the fact undisputed. Fed. R. Civ. P. 56(e)(2). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the

- 13 -

requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis in original).

**B. Plaintiff's Accommodation and Discrimination Claims Fail**[2]

"The ADA places the burden on the employee to establish a prima facie case of disability discrimination." Davis v. Fla. Power & Light Co., 205 F.3d 1301, 1304 (11th Cir. 2000). "To state a *prima facie* claim for failure to accommodate, the plaintiff must show that: (1) he is disabled; (2) he is a qualified individual; and (3) he was discriminated against by way of the defendant's failure to provide a reasonable accommodation." McKane v. UBS Fin. Servs., Inc., 363 Fed. Appx. 679, 681 (11th Cir. 2010). A *prima facie* ADA discrimination claim similarly requires a plaintiff to "show that, at the time of the adverse employment action, he had a disability, he was a qualified individual, and he was subjected to unlawful discrimination because of his disability." Mazzeo v. Color Resols. Int'l, LLC, 746 F.3d 1264, 1268 (11th Cir. 2014).

Plaintiff has failed to demonstrate a *prima facie* discrimination claim or failure to accommodate claim, for three reasons. First, Plaintiff is not a "qualified individual" because his alleged disability prevents him from being able to perform

---

[2] Because Defendant asserts that Plaintiff fails to demonstrate the same elements as to both claims, Defendant addresses these claims together. *See* Patterson v. City of Melbourne, 669 F.Supp.3d 1204, 1230 (M.D. Fla. 2023) ("To the extent the [ADA accommodation and ADA discrimination] claims overlap, the Court will address them together.").

the essential functions of a plans examiner. Second, Plaintiff is not disabled. The medical provider that Plaintiff chiefly relies on expressly refused to diagnose Plaintiff with any condition, and found that any abnormalities in Plaintiff's brain were causing him no functional limitations to his daily living activities. Third, and finally, Plaintiff's all-or-nothing pursuit of the specific accommodation he wanted stymied the interactive process, and prevented Defendant from identifying a reasonable accommodation. For these three reasons, Plaintiff's failure to accommodate and discrimination claims fail.

1. _Physical Presence, Both in the Office and at Site Visits, is an Essential Function of the Plans Examiner Role_

A "qualified individual" under the ADA is "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds." 42 U.S.C. § 12111(8). "If the individual 'is unable to perform an essential function of his...job, even with an accommodation, he is, by definition, not a 'qualified individual' and, therefore, not covered under the ADA.'" D'Angelo v. ConAgra Foods, Inc., 422 F.3d 1220 (11th Cir. 2005). "In other words, the ADA does not require the employer to eliminate an essential function of the plaintiff's job." Id., at 1229.

"Essential functions are 'the fundamental job duties of the employment position the [disabled employee] holds or desires.'" Williams v. Revco Disc. Drug Centers, Inc., 552 Fed. Appx. 919, 921 (11th Cir. 2014) (quoting 29 C.F.R.

§ 1630.2(n)(1)). "Whether something is an essential function is 'evaluated on a case-by-case basis by examining a number of factors,'…including 'the employer's judgment as to what functions of a job are essential' and any 'written description [prepared] before advertising or interviewing applicants for the job.'" Morris-Huse v. GEICO, 748 Fed. Appx. 264, 266 (11th Cir. 2018) (citations omitted). "The court…gives 'substantial weight' to the employer's judgment as to which functions are essential, and 'the inquiry into essential functions is not intended to second guess an employer's business judgment with regard to production standards.'" Waldrop v. Gwinnett Cnty. Sch. Dist., 2023 WL 9688352 (N.D. Ga. 2023), report and recommendation adopted, 2024 WL 1333041 (N.D. Ga. Mar. 2024) (citations omitted). Courts also consider factors such as "the consequences of not requiring the incumbent to perform the function." D'Angelo, 422 F.3d at 1230; see also 29 C.F.R. § 1630.2(n)(3).

The overwhelming majority of courts that have considered ADA claims based on failure to permit 100% remote work found "physical presence to be an essential function of most jobs." Waldrop, 2023 WL 9688352 at *7; Morris-Huse, 748 Fed. Appx. at 267 ("[A]n accommodation allowing Morris-Huse to work remotely would not have been reasonable because it would not have allowed her to perform the essential functions of her position."); Garrison v. City of Tallahassee, 664 Fed. Appx. 823, 826 (11th Cir. 2016) (finding "full-time physical

attendance" to be an essential function); Weber v. BNSF Ry. Co., 989 F.3d 320, 325 (5th Cir. 2021) ("[T]here is a general consensus among courts…that regular work-site attendance is an essential function of most jobs."). The holding of these cases is grounded in the reality that most jobs require teamwork, coordination, and supervision, all of which are substantially hindered by a lack of physical presence at the site. *See* Kiesel v. Delta Air Lines, Inc., 2024 WL 5717552, at *8 (N.D. Ga. 2024), *report and recommendation adopted*, 2024 WL 5717940 (N.D. Ga. 2024) (crediting an employer's testimony that "being in the office allowed Plaintiff to get input from different people and build relationships to make interactions go smoother"); E.E.O.C. v. Ford Motor Co., 782 F.3d 753, 762 (6th Cir. 2015) ("[I]n most jobs, especially those involving teamwork and a high level of interaction, the employer will require regular and predictable on-site attendance from all employees.").

In this case, all of the relevant factors weigh heavily in favor of finding that physical presence, both at site visits and at the office, is an essential function of the plans examiner position. First, with respect to the testimony of Plaintiff's supervisors, Chief McMurray, Chief Labbe, and Chief Fullum all testified that physical presence at building sites and at the office is an essential function of the plans examiner position. With respect to site inspections, Chief McMurray, Chief Labbe, and Chief Fullum each provided detailed testimony explaining the value of

having plans examiners and inspectors come together at site inspections to share technical expertise and communicate concerns about projects that may not be apparent from a review of electronic plans. Labbe Dep. at 39:2-25, 40:1-17; McMurray Dep. at p. 29:11-20; 104:16-25, 105:1-6; Fullum Dep. at p. 40:10-16, 41:6-12. Furthermore, both Chief Labbe and Chief McMurray testified that it was essential to have plans examiners in the office for team meetings and group collaboration when complex or novel problems arose during the plan review and inspections process. Labbe Dep. at p. 22:8-19, 93:1-13; McMurray Dep. at p. 63:6-15, 64: 1-15. These concerns regarding communication are quintessential business values that Defendants cannot be forced to abandon when crafting a reasonable accommodation.

Second, the job description summarizing the plans examiner role clearly contemplates site visits, collaboration, and teamwork, all of which would be impossible or substantially impeded by 100% remote work. Plans examiners are required to assist with "building inspectors and fire inspectors with field review questions." Job Description at p. 2, Ex. A. When problems with a project are complex or not discernable from the electronic plans, assisting with these field review questions will require the plans examiner to appear at the job site. McMurray Dep. at p. 105:16-25, 106:1-6; Fullum Dep. at p. 40:10-16, 41:6-12. Furthermore, when disputes or ambiguities regarding code application arise, plans examiners must

- 18 -

"[n]egotiate[] and develop[] mutually acceptable solutions to code conformance problems and life safety issues with architects, engineers, contractors, and the public." Job Description at p. 1, Ex. A. This clearly contemplates a public-facing customer service role, in which the plans examiner must be available to meet and work with business owners and land developers, whether that be at the Defendant's office, in the field, over the phone, or via email. Labbe Dep. at p. 26:12-25, 93:14-21; McMurray Dep. at p. 66:4-13. Notably, Plaintiff attended and even asked to attend multiple site inspections (without mentioning any disability that required him to work solely from home) before he filed his request for accommodation. Site Visits, Ex. H.

Third, the consequences of allowing Plaintiff to work 100% remote would substantially interfere with Defendant's ability to serve its constituents. Granting Plaintiff 100% remote work would require Defendant to shift Plaintiff's site visit and other in-person responsibilities to other employees. Requiring other plans examiners to step in and pick up Plaintiff's slack would "reallocate job duties in order to change the essential functions of [Plaintiff's] job," which the ADA does not require. Geter v. Schneider Nat'l Carriers, Inc., 2023 WL 7321610, at *13 (11th Cir. 2023).

Fourth, and finally, the best evidence available for determining the essential functions of this job is to look at how Plaintiff himself did the job. Prior to COVID,

Plaintiff was working fully in person. <u>Plaintiff Dep.</u> at p. 145:8-17. And even after COVID began, Plaintiff continued to appear both at site visits and in the office. Indeed, up until he elected to go on FMLA leave, Plaintiff continued attending in-person meetings, and was working in-person at the Planning and Sustainability Office on a weekly basis. <u>FMLA Leave Emails</u> at p. 5–6, Ex. Q.

> 2. *Plaintiff is Not Disabled*

Under the ADA, a disability is defined as "a physical or mental impairment that substantially limits one or more major life activities of" an individual. 42 U.S.C § 12102(1). While an alleged impairment need not "significantly or severely restrict" a major life activity, the ADA's plain text does require that an alleged impairment "substantially limit[]" a major life activity. 29 C.F.R. § 1630.2(j)(1)(ii). Accordingly, "not every impairment will constitute a disability within the meaning of" the ADA. <u>Id.</u> Furthermore, the ADA's protections only cover discrimination based on "impairments that exist *at the time of the adverse employment action* and does not include impairments that manifest after the alleged discrimination." <u>EEOC v. STME, LLC</u>, 938 F.3d 1305, 1315 (11th Cir. 2019) (emphasis added). A claim cannot be based on "a potential future disability." <u>Id.</u> at 1316.

The evidence clearly indicates Plaintiff showed no signs of any functional cognitive limitations in 2023. With respect to Dr. Cantor's 2023 evaluation, Dr. Cantor clearly expressed to Plaintiff that his average to above average test score

- 20 -

showed no observable, cognitive impairments. <u>Cantor Collins Phone Call Transcripts</u> at p. 19, 38, Ex. E. Indeed, Plaintiff's lack of functional limitations is apparent from the fact that Dr. Cantor did not endorse remote work until Plaintiff repeatedly badgered him into doing so in July 2023. Furthermore, the "excess delta waves" identified in Plaintiff's brain scans did not impair any of Plaintiff's major life activities. <u>Id.</u> at p. 19, 38. To the extent Plaintiff's alleged disability is solely "early onset dementia," without any current functional limitations, Plaintiff is seeking an accommodation for "a potential future disability," which is not protected under the ADA. <u>STME, LLC</u>, 938 F.3d at 1316.

With respect to Paige McBryar, her evaluations are either conclusory or entirely reliant on Dr. Cantor's evaluations. Indeed, McBryar's repeated citation to Plaintiff's three-year-old evaluation show her assessment was based only on Dr. Cantor's findings (which found no functional impairments), or Plaintiff's self-reported symptoms, which cannot themselves form the basis of an ADA claim. *See* <u>Eisenberg v. Permanente Med. Grp.</u>, 855 F.Supp.2d 1002, 1013 (N.D. Cal. 2012) ("[B]ased on his own self-reporting of symptoms and without other corroborating evidence, plaintiff cannot be said to have been significantly restricted in any major life activities.")

Finally, Plaintiff cannot rely on Dr. Scott Duncan's 2019 assessment because Dr. Duncan never recommended that Plaintiff be permitted to perform 100% remote

work. Duncan Medical Records, Ex. V. Furthermore, Dr. Duncan's findings were made over three years before Plaintiff began seeking an accommodation. Thus, to the extent they conflict with Dr. Cantor's more recent findings that Plaintiff was not suffering from any observable metal impairments, Dr. Duncan's results are irrelevant for determining whether Plaintiff was functionally disabled "at the time of the adverse employment action." Mazzeo, 746 F.3d at 1268.

### 3. *Plaintiff Refused to Participate in the Interactive Process*

"Liability simply cannot arise under the ADA when an employer does not obstruct an informal interactive process; makes reasonable efforts to communicate with the employee and provide accommodations based on the information it possesses; and the employee's actions cause a breakdown in the interactive process." Stewart v. Happy Herman's Cheshire Bridge, Inc., 117 F.3d 1278, 1287 (11th Cir. 1997).

Dominque Grant made substantial efforts to understand how Plaintiff's alleged disability impacted Plaintiff's ability to perform his job. After diligently seeking the necessary information from Paige McBryar, Grant crafted an accommodation that would account for Plaintiff's alleged disability, while also still allowing Plaintiff to perform the essential functions of his job. But Plaintiff was only ever interested in receiving one specific accommodation: fully remote work. Plaintiff rejected the accommodation of a private office without even bothering to

visit the office to see if it could possibly satisfy his needs. Plaintiff's insistence on this specific accommodation, and his refusal to consider any alternatives, prevented Defendant from finding a reasonable compromise that could allow Plaintiff to continue working as a plans examiner.

### C. **Plaintiff's Interference Claim Fails**

While the Eleventh Circuit has yet to clearly articulate the proper standards for evaluating an ADA anti-interference claim, several courts have found that a plaintiff must show: "1) [the plaintiff] exercised a right protected by the ADA; 2) [the defendant] coerced, intimidated, threatened, and/or interfered with [the plaintiff's] enjoyment of [his or] her ADA rights; and 3) [the defendant's] actions were motivated because [the plaintiff] exercised a right protected by the ADA." Callahan v. Emory Healthcare, Inc., 2022 WL 18927486, at *14 (N.D. Ga. 2022), report and recommendation adopted, 2023 WL 2334987 (N.D. Ga. 2023) (citation omitted, alterations in original).

Here, the evidence conclusively shows that Defendant terminated Plaintiff solely because Plaintiff was refusing to work from anywhere except his home, and was therefore unable to perform the essential functions of his job. Defendant did everything in its power over the course of months to assist Plaintiff in identifying a reasonable accommodation. Plaintiff was only terminated once it became clear that he would not consider accepting anything but the unreasonable accommodation of

4933-1730-8257, v. 2

100% remote work. Defendant's refusal to give Plaintiff an accommodation that eliminated essential functions does not amount to interference.

### D. <u>Plaintiff's Retaliation Claim Fails</u>

Under the burden shifting framework applicable to retaliation claims, the Plaintiff must first establish three things: (1) that he engaged in statutorily protected conduct; (2) that he suffered an adverse employment action; and (3) that a causal connection exists between the two. <u>Batson v. Salvation Army</u>, 897 F.3d 1320, 1329 (11th Cir. 2018). "[T]he burden then shifts to the employer to articulate a nondiscriminatory reason for the adverse action." <u>Id.</u> At this step, the employer's burden "is merely one of production; it need not persuade the court that it was actually motivated by the proffered reasons." <u>Vaughn v. FedEx Freight, Inc.</u>, 824 Fed. Appx. 797, 802 (11th Cir. 2020). Once the employer carries that burden, "the plaintiff bears the ultimate burden to show that the proffered nondiscriminatory reasons 'are a pretextual ruse designed to mask retaliation.'" <u>Callahan,</u> 2022 WL 18927486, at *11 (citation omitted).

Defendant clearly had nondiscriminatory reasons for terminating Plaintiff, and Plaintiff has presented no evidence indicating these reasons were pretextual.[3] Plaintiff was terminated due to his inability to perform essential functions of the

---

[3] Defendant does not concede that Plaintiff has established a *prima facie* case. However, given the strong evidence showing a lack of discriminatory intent, the Court need not reach that question in order to grant Defendant summary judgment.

4933-1730-8257, v. 2

plans examiner role from home. Plaintiff cannot succeed on a retaliation claim based solely on Defendant's refusal to provide an unreasonable accommodation. Furthermore, Plaintiff's allegation that Defendant "forced [Plaintiff] to go on unpaid leave" prior to his termination is inconsistent with the record evidence. (Doc. 1 at ¶ 62). Plaintiff voluntarily elected to go on FMLA leave during the pendency of his accommodation request, and was paid for all his leave time when his FMLA leave ended. Nothing in the ADA requires an employer to continue paying an employee who has abandoned the interactive process and stopped coming to work.

## III.  CONCLUSION

For all the above stated reasons, Defendant respectfully requests that this Court dismiss all Plaintiff's claims against him.

This 21st day of August, 2025.

Respectfully submitted,

**Cruser, Mitchell, Novitz, Sanchez, Gaston & Zimet, LLP**

*/s/ Michael D., Hoffer*
Michael D. Hoffer
Georgia Bar No. 359493
Email:  mhoffer@cmlawfirm.com
Direct Dial: (404) 737-8443

Meridian II, Suite 2000
275 Scientific Drive
Peachtree Corners, GA 30092

*(Attorney for Defendant)*

4933-1730-8257, v. 2

## <u>CERTIFICATE OF COMPLIANCE WITH L.R. 7.1</u>

The undersigned attests that this document was prepared in Times New Roman, 14-point font that complies with this Court's Rules.

This 21st day of August, 2025.

**Cruser, Mitchell, Novitz, Sanchez, Gaston & Zimet, LLP**

*/s/ Michael D. Hoffer*
Michael D. Hoffer
Georgia Bar No. 359493

- 26 -

## <u>CERTIFICATE OF SERVICE</u>

I certify that I electronically filed the foregoing ***BRIEF IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT*** with the Clerk of Court using the CM/ECF system which will automatically send email notification to all counsel of record.

This 21st day of August, 2025.

**Cruser, Mitchell, Novitz, Sanchez,
Gaston & Zimet, LLP**

*/s/ Michael D. Hoffer*
Michael D. Hoffer
Georgia Bar No. 359493

- 27 -