# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| **PATRICK MICHAEL COLLINS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Case No. 1:24-cv-01252-LMM-CMS** |
| **v.** | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| **DEKALB COUNTY, GA,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Patrick Michael Collins submits the following response to Defendant's motion for summary judgment.

## I.     INTRODUCTION

Defendant's tired attempt to portray this matter as just another person unwilling to return to work following the COVID-19 pandemic falls flat. As Defendant well knows, Plaintiff's disabilities and the need for accommodations predate even the earliest stages of the pandemic. What is clear, however, is that Defendant used the end of the pandemic as an excuse to impose a blanket return-to-office mandate that it indiscriminately applied to all employees without regard for their specific needs and/or job duties. Incredibly, on the last day of discovery in this case, Chief Tremayne McMurray **admitted** that Defendant's refusal to provide

necessary accommodations to Plaintiff had nothing to do with Plaintiff's specific situation, but, rather, was entirely prompted by the County's blanket return-to-office directive. Defendant never attempted to do a fair review of Plaintiff's accommodation request; rather, Defendant has consistently reverse engineered pretextual excuses to arrive at the foregone conclusion that Plaintiff, like everyone else, had to return to in-office work. As set forth herein, Plaintiff has proffered more than sufficient evidence from which a jury could find for Plaintiff on each of his claims. Thus, Defendant's motion for summary judgment should be denied.

## II.    FACTS

### A. Plaintiff's Disabilities

Mr. Collins was first diagnosed with Attention-Deficit Hyperactivity Disorder 25 years ago. (Collins Decl. ¶ 3.) In 2019, Mr. Collins began experiencing severe mental health issues and what he perceived as cognitive decline. (*Id.* at ¶¶ 4-5.) He was taking Concerta to manage his ADHD, but was still experiencing significant sensory issues, irritability, sensitivity to movement and minor sounds, short attention span, memory issues, and brain fog. (*Id.* at ¶ 4.)

Mr. Collins reached out to a few different providers for psychological evaluation in 2019. (Collins Decl. ¶ 5.) At Psychiatric Professionals of Georgia, he was diagnosed with bipolar disorder and prescribed Lithium. (*Id.* at ¶ 6.) He was then evaluated by Scott A. Duncan, Psy. D, who confirmed Mr. Collins's ADHD

diagnosis. (*Id.* at ¶ 7.) Mr. Collins then reached out to David Cantor, PhD, for a more thorough neuropsychological examination. (*Id*. at ¶ 8.)

Dr. Cantor ran several different batteries of tests on Mr. Collins in February 2020 to assess potential brain dysfunction. (Collins Decl. ¶ 9.) The neurofunctional tests revealed "cortical dysfunction consistent with individuals who can exhibit problems with executive functioning problems, memory challenges, and mood regulation problems." (*Id.* at ¶ 10.) Dr. Cantor discovered that Mr. Collins has excessive delta in his brain, which could be indicative of a few different conditions, including early stage cognitive decline disorder (like dementia), major depression, or some type of narcoleptic disorder. (*Id.* at ¶¶ 10-11.)

Dr. Cantor told Mr. Collins to return for continued testing and referred Mr. Collins to Arthur Schiff, MD, at Georgia Neurology Care PC. (Collins Decl. at ¶¶ 10-12; *see* Doc. 61-5.) Dr. Schiff diagnosed Plaintiff with ADHD, persistent mood disorder, mental disorder, and potential explanations for the deviant brain activity, including dementia, "transient cerebral ischemic attack," and "localization-related (focal) (partial) idiopathic epilepsy and epileptic syndromes with seizures of localized onset, intractable, without status epilepticus." (*Id.* at ¶ 12; *see* Doc. 70-7.)

As directed, Mr. Collins completed additional testing (so-called "brain mapping") with Dr. Cantor in 2021 and 2023. (*See* Doc. 61-14, pp. 34-35.) On July 5, 2023, Dr. Cantor concluded that Mr. Collins's frontal lobes—which are involved

in "mood regulation," "attention," "planning," "organizational skills," etc.—"are not functioning the way they should." (Collins Decl. at ¶ 15; Doc. 61-6, p. 18.) He also explained that Mr. Collins has "pervasive excess of delta all throughout the brain," and particularly in the hippocampus, which is "exorbitantly deviant"—"ten standard deviations out from normal," which is "just extremely high." (*Id.*) The worst spot was "toward the back of the head," which he explained has to do with "vision processing" and "poor vision memory." (*Id.*) Mr. Collins's activity in that area of the brain was "about five standard deviations too low," which Dr. Cantor said constituted "physiological evidence [of] things related to vision, vision memory, memory, et cetera." (*Id.*) Mr. Collins's neurometric qEEG results put him at 2nd percentile for visual memory (i.e. his visual memory was worse than 98% of people). (Collins Decl. at ¶ 14; Doc. 61-6, p. 5.)

Parallel to his testing with Dr. Cantor, Mr. Collins reestablished care at Psychiatric Professionals of Georgia. (Collins Decl. at ¶ 17; Doc. 61-15.) Mr. Collins was evaluated by Paige McBryar, NP, on April 26, 2023, June 14, 2023, and July 25, 2023. (*Id.*) McBryar confirmed the previous diagnosis of bipolar disorder and added generalized anxiety disorder. (*Id.*)

### B. Plaintiff's employment with Defendant

Mr. Collins started working as a plans examiner (also known as "plan reviewer") for Dekalb County in October 2019. (DSMF ¶ 1.) The "purpose" of the

plans examiner position is "to review and coordinate all proposed construction documents in compliance with local, state, and federal building, structural, fire, accessibility and system codes, policies, rules, regulations and standards." (Doc. 61-2; *see also* Labbe Dep. 59:13-60:10; Fullum Dep. 42:7-43:3.) The core duties of plan reviewers involve reviewing building plans that are submitted electronically through a software called ProjectDox and determining if they comply with applicable codes. (*See, e.g.,* Smith Dep. 24:23-25:15; Labbe Dep. 20:4-21:25, 23:1-22, 116:17-20; Miller Decl. ¶ 7; Price Decl. ¶ 6; Pruitt Decl. ¶¶ 5-6.) Plan reviewers provide comments to clients through ProjectDox and another software application called Hansen. (Labbe Dep. 23:7-8, 24:6-25:15; McMurray Dep. 35:13-36:8.) A plan reviewer may also communicate via email with the customer or to the architect or engineer if he or she has questions about the plan. (Labbe Dep. 24:6-21; Price Decl. ¶ 6.) Once a plan reviewer approves a plan, a permit can be issued and building can begin. (Smith Dep. 24:23-25:15; McMurray Dep. 35:2-12, Price Decl. ¶ 6; Pruitt Decl. ¶ 6.) It is then the inspector—who has different licensing and job requirements—who inspects the building site in person to ensure the plan and all applicable codes are complied with. (Smith Dep. 25:18-26:3; Labbe Dep. 42:14-22; McMurray Dep. 40:3-16; Miller Decl. ¶¶ 7-11, Price Decl. ¶ 7; Pruitt Decl. ¶ 6.)

Occasionally, inspectors ask plan reviewers to come to the jobsite if they have questions about a plan; however, it is not the plan reviewer's job to inspect the

jobsite. (McMurray Dep. 37:22-40:16; Miller Decl. ¶¶ 7-11; Price Decl. ¶ 8; Pruitt Decl. ¶ 7.) In fact, after Chief Labbe joined the department, he repeatedly told the plan review unit that plan reviewers were not allowed to visit job sites because he did not want anyone other than leads/supervisors or him (chief fire marshal) to do field visits. (Labbe Dep. Ex. 1; McMurray Dep. 61:20-64:24; Collins 114:18-115:12, 124:1-126:10, 236:17-238:11, Pl. Ex. 2; Collins Decl. ¶¶ 40, 42.) While Chief McMurray testified that he later overruled Chief Labbe on this point and "encourag[ed]" plan reviewers to occasionally go to job-sites for learning purposes and to move projects along," he conceded that conducting site visits "wasn't a requirement." (McMurray Dep. 61:20-65:23.) Indeed, Chief Labbe, Chief McMurry, Plaintiff, Plaintiff's lead (Tony Pruitt), plan review manager (Rodney Miller), and supervisor (Mike Price) all testified that plan reviewers are not expected or required to visit jobsites. (McMurray Dep. 65:21-23; Labbe Dep. 38:21-39:1; Miller Decl. ¶¶ 7-12; Price Decl. ¶¶ 7-8; Pruitt Decl. ¶¶ 6-7; Collins Dep. 141:13-24.)

There is no job-related need for plan reviewers to work in person in the office, and plan reviewers are not required to meet with stakeholders in person. (Miller Decl. ¶¶ 20-22; Price Decl. ¶¶ 9-10; Pruitt Decl. ¶¶ 8-9.) Virtually all of plan reviewers' communication with stakeholders, including builders, architects, and inspectors, occurs via email, phone, Teams, or Zoom. (Miller Decl. ¶¶ 20-22; Price Decl. ¶¶ 9-10; Pruitt Decl. ¶ 8.) If a client insists on meeting in person at the office,

6

then someone at the office "can easily cover for a plan reviewer who has to work remotely." (Pruitt Decl. ¶ 8.)

When Mr. Collins first joined Defendant, it quickly became apparent how difficult it was for him to do work in his assigned office. (Collins Decl. ¶¶ 22-23.) He experienced significant difficulty staying on task, maintaining focus, and processing information. (*Id.*) He experienced brain fog and difficulty keeping his brain "on track" as he reviewed plans and code sections. (*Id.*) He was extremely distracted by the sounds of other people working and walking around the office, phones ringing, and co-workers coming by his office. (*Id.*) As detailed *supra*, he was seeing several different providers at the time for evaluation.

When Mr. Collins received Dr. Cantor's February 2020 report, he immediately shared it with his immediate supervisors at the time, Price and Miller. (Collins Decl. ¶ 24; Collins Dep. 78:7-79:11.) Mr. Collins explained the difficulties he experienced working in the office and asked permission to work from home exclusively. (*Id.*; Price Decl. ¶ 11; Miller Decl. ¶ 15.) Price and Miller approved his request to work from home and only asked that he provide a copy of the report to the Chiefs' administrators, so they could put the report in his employee file. (Collins Dep. 78:7-85:3; Collins Decl. ¶ 25.)

Mr. Collins had numerous conversations with his immediate supervisors between 2020 and 2023 about his ADHD, brain abnormality, difficulty focusing,

and how working remotely helped him maintain the required focus to successfully complete his job. (Collins Decl. ¶ 26; Price Decl. ¶ 11; Miller Decl. ¶ 15.)

When Dekalb County began pushing a return-to-office mandate in December 2022, Mr. Collins spoke with Chief McMurray about his medical need to continue working remotely. (Collins Decl. ¶ 27; McMurray Dep. 23:17-25, 43:11-21, 73:3-9.) He pointed Chief McMurray to the February 2020 Cantor report, which McMurray then shared with the fire department's HR liaison, Monica Smith. (McMurray Dep. 43:11-49:5, Exs. 1-2.)

Mr. Collins had an additional conversation with Chief McMurray about his medical conditions and the need for a remote work accommodation in the first week of January 2023. (Collins Decl. ¶ 27; McMurray Dep. 57:4-58:8, Ex. 3.) Chief McMurray looped in Smith, who told Plaintiff that he would have to complete a formal ADA accommodation request for a remote work accommodation. (Smith Dep. 34:16-35:18; Collins Decl. ¶ 28.) On January 31, 2023, Mr. Collins had a long conversation with Smith about his ADHD, abnormal brain function, and the need to work remotely to maintain focus. (Smith Dep. 35:19-38:12; Collins Decl. ¶ 29.) He also submitted a completed accommodation request form dated January 31, 2023. (Smith Dep. 39:16-40:5; Collins Decl. ¶ 29.)

The record is clear that Defendant never had any intention of seriously considering Plaintiff's accommodation request. When Smith learned of Plaintiff's

medical conditions, she immediately asked Dominique Grant in HR for permission "to send Collins for a Psychological Fitness for Duty Exam." (Doc. 70-6, pp. 5-9.) Grant responded: "Please allow HR to go through the Interactive process with this employee first. It has been my experience that these things workout them selves because providers usually send recommendation instead of restrictions. HR needs specific restrictions in order to find acceptable accommodations." (Doc. 70-6, p. 2.)

Over the next few months, Grant proceeded to reject virtually all documentation provided by Collins and his providers and seemed to look for any excuse to deem the request incomplete, illegible, unclear, etc. (Doc. 67, at 37:1-64:13; Doc. 67-1, pp. 1-36.) At Grant's insistence, McBryar submitted three different medical certifications and two letters with further clarification about Collins's medical restrictions. (Doc. 67 at 37:1-64:13; Doc. 67-1, pp. 1-36; Doc. 61-22.) Dr. Cantor also provided a letter recommending that Plaintiff work remotely due to his neuropsychological limitations. (Doc. 61-14, pp. 34-35.)

While this drawn-out accommodation process was ongoing, Defendant harassed Plaintiff about needing to return to work in person five days a week. (McMurray Dep. 49:9-56:13, 70:15-23, Exs. 3-4; Collins Decl. ¶¶ 32, 34-36.) In April-May 2023, Mr. Collins tried to come into the office one day a week. (Collins Decl. ¶ 33.) However, when he came in, he was extremely hyper, unable to focus,

and anxious. (*Id.*) He was utterly unable to perform any work that required deep focus while in the office because of the noise and distractions. (*Id.*)

On May 16, 2023, Chief McMurray scolded Plaintiff in front of co-workers and staff for not having returned to in-office work five days a week. (Collins Dep. 166:8-168:6; Collins Decl. ¶ 34.) He got close to Mr. Collins's face and towered over him in an intimating manner while demanding: "you're coming in the office five days a week, starting tomorrow." (*Id.*) Mr. Collins protested that he was in the process of requesting accommodations for a disability that Chief McMurray knew about and asked permission to work remotely while the request was pending. (*Id.*) Chief McMurry responded that he did not care about the pending accommodation request. (*Id.*) When Mr. Collins protested that he had been working remotely for years, Chief McMurray responded: "while that may have been the case, that's no longer the case based on the directive that we had." (McMurray Dep. 73:12-19, 103:8-24.) He told Plaintiff that if the CEO wanted him in the office, then he had to be in the office. (Collins Dep. 131:15-22; Collins Decl. ¶ 34.)

Shortly thereafter, Smith and Chief McMurray told Mr. Collins that if he was unable to return to work in person while the accommodation request was pending, then he would have to apply for FMLA leave to avoid being terminated. (Smith Dep. 85:19-88:9, 94:6-12; Collins Decl. ¶ 36.) Mr. Collins subsequently applied for

FMLA leave because he understood that he would be terminated if he did not do so. (Collins Dep. 131:24-132:4; Collins Decl. ¶ 37.)

Smith told Plaintiff that in order to return from FMLA leave, he had to provide a doctor's release clearing him to return to work in person without any restrictions. (Smith Dep. 92:15-93:11.) At the time of their communication, Smith knew that (1) Collins needed ADA accommodations to be able to perform his essential duties, and (2) Collins would not be allowed to return from FMLA leave without offering proof that he did not need such accommodations (i.e. that he was fully cleared to return to work with no restrictions). (Smith Dep. 92:15-93:11.)

On July 11, 2023, Defendant told Mr. Collins that Defendant would accommodate his medical needs by providing him with an "office." **(**Collins Decl. ¶ 38; Grant Dep. Ex. 6, 68:13-69:24.) This alleged "accommodation" was nonsensical, as Mr. Collins already had an assigned office, as did all of the other plan reviewers. **(**Collins Decl. ¶ 38; Collins Dep. 130:18-131:22; Smith Dep. 57:19-58:6; Labbe Dep. 77:8-14, 78:23-79:5; McMurray Dep. 82:4-7, 93:22-97:2; Pruitt Decl. ¶ 10; Price Decl. ¶ 13.) The "accommodation" just offered Mr. Collins something he and the other plan reviewers already had, and which Mr. Collins and his providers had repeatedly explained was insufficient to address Mr. Collins's medical needs. **(***Id.*) Plaintiff therefore renewed his request for a remote work accommodation and provided yet another provider letter in support. **(***Id.*; *see* Doc. 61-19, p. 2.)

When Mr. Collins's FMLA leave expired on August 8, 2023, HR reiterated that he could not return to work without a release from his doctor saying he could return to work in the office without any restrictions. (Collins Decl. ¶ 39.) Mr. Collins explained that he still had the same medical restrictions as before, which is why he had requested a remote work accommodation. (*Id.*) Mr. Collins was in contact with both Smith and Grant about his inability to work in the office when his FMLA ended. (*Id.*) Mr. Collins had over a hundred hours of unused, accrued personal leave, and he notified HR that he wished to use the annual leave until the accommodation request had been resolved. (*Id.*)

On August 24, 2023, Plaintiff was notified via email and phone call with Grant that his ADA request for a remote work accommodation had been denied because it would "eliminate essential functions of his job specifically the field review requiring Patrick Collins to go on location and assist building and fire inspectors in determining structural soundness, proper installation, materials, or equipment," and "would also eliminate or substantially inhibit the essential function of interacting and coordinating with builders, owners, architects, engineers, and the Development Services Department." (Collins Decl. ¶¶ 41-42.)

On August 31, 2023, Plaintiff received a "notice of intent to terminate" from Dekalb County threatening to terminate Plaintiff for alleged excessive absences. (Collins Decl. ¶ 43.) Plaintiff complained to Grant, Smith, Chief Fullum, Chief

McMurray, and Chief Labbe of disability discrimination and failure to accommodate his disabilities. (Collins Decl. ¶¶ 43-45.)

On October 30, 2023, Plaintiff received a termination letter from Dekalb County stating he was being terminated "due to [his] inability or unwillingness to perform essential functions of [his] position," namely "visiting job sites." (Collins Decl. ¶ 46; Doc. 66-1 pp. 30-31.)

## III.   ARGUMENT

Defendant discriminated and retaliated against Plaintiff in violation of the ADA and unlawfully interfered with Plaintiff's statutory rights.

### A. MR. COLLINS HAS ESTABLISHED A TRIABLE ISSUE OF DISABILITY DISCRIMINATION

Plaintiff has established a *prima facie* case of disability discrimination by showing that (1) he has a disability, (2) he was otherwise qualified to perform his job, and (3) he was discriminated against based on his disability. *Cleveland v. Home Shopping Network, Inc.*, 369 F.3d 1189, 1193 (11th Cir. 2004).

### i.   Mr. Collins Has a Covered Disability

Under the ADAAA, an impairment is a disability "if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population. " 29 C.F.R. § 1630.2(j)(ii).  The ADAAA defines "major life activity" as including, in relevant part, "learning, reading, concentrating, thinking, communicating, interacting with others, and working" and the "operation

of a major bodily function," including "neurological" and "brain" functions. 29 C.F.R. § 1630.2(i)(1)(i)-(ii).

As shown above, Mr. Collins has at all relevant times been diagnosed with ADHD, bipolar disorder, other mood disorder, and abnormal brain function. (PSAF 31-39.) Mr. Collins has testified that as a result of his disabilities, he has at all relevant times suffered from emotional dysregulation, hyperactivity, difficulty maintaining focus, extreme sensitivity to sounds and other external stimuli, and memory issues. (Collins Dec. ¶¶ 18-21.) Mr. Collins's poor visual memory and processing is especially evident when Mr. Collins is distracted by external stimuli such as sounds. (*Id.* at ¶ 19-20.) For example, he is suddenly unable to do even the most basic mathematical calculations and intermittently forgets what he was just doing, seeing, or reading. (*Id.* at ¶19.) Mr. Collins is therefore substantially limited in the major life activities of "learning, reading, concentrating, thinking, communicating, interacting with others, and working" and in the operation of his "neurological" and "brain" functions. 29 C.F.R. § 1630.2(i)(1).

Under the ADAA, "an impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting"; instead, it need only "substantially limit[] the ability of an individual to perform a major life activity *as compared to most people in the general population*." 29 C.F.R. § 1630.2 (j)(1)(i)-(iv) (emphasis added). Here, Plaintiff's

medical records confirm that he is substantially limited in these functions compared to the general population. As stated *supra*, Plaintiff has an "exorbitantly deviant" hippocampus that is "ten standard deviations out from normal" and worse vision memory and processing capacity than 98% of people. (PSAF 35-38.)

Plaintiff has therefore established more than a triable issue of whether he has a disability as defined under the ADAAA. *See, e.g., United States Equal Emp. Opportunity Comm'n v. St. Joseph's Hosp., Inc.*, 842 F.3d 1333, 1343 (11th Cir. 2016); *Mazzeo v. Color Resols. Int'l, LLC*, 746 F.3d 1264, 1268 (11th Cir. 2014).

### ii. Mr. Collins Was a "Qualified Individual"

Defendant claims Plaintiff was not a qualified individual because he could not perform the alleged essential functions of physical presence in the office and at job sites. Defendant's claim is directly contradicted by the testimony of its own Chiefs and supervisors. Chief McMurray, Chief Labbe, Plan Review Manager Miller, Supervisor Price, and Lead Pruitt have uniformly testified that plan reviewers were not expected or required to visit jobsites. (PSAF 52.) Additionally, Manager Miller, Supervisor Price, and Lead Pruitt have all testified that none of Mr. Collins's essential job duties required him to be physically present in the office, and that plan reviewers can perform their essential functions remotely. (PSAF 53-54.)

Notably, both Chief Labbe and Chief McMurry testified that the efforts to bring Collins back to work had nothing to do with his actual job functions and was

solely motivated by the CEO's and Chief Fullum's directive that *everyone* in the fire department, without exception, return to the office. (PSAF 56.) It is also undisputed that Mr. Collins never exhibited any performance issues during his three years of working remotely. (PSAF 55.)

These facts more than establish a triable issue of whether Plaintiff was "qualified" for his job. *See* 29 C.F.R. § 1630.2(m).

### iii.  Plaintiff Was Discriminated Against "Because of" his Disabilities

Plaintiff can establish the third element of his disability discrimination claim both by showing that (1) Defendant failed to provide reasonable accommodations for a known disability, and (2) Defendant took an adverse action against him because of his disability. 42 U.S.C. § 12112(b)(1) & (5).

### (a) Mr. Collins Has Established a Triable Issue of Failure to Accommodate

To establish a triable issue of failure to accommodate, Plaintiff need only show that he is an otherwise qualified disabled individual within the meaning of the ADA, and that Defendant failed to provide a reasonable accommodation. *See, e.g., Holly v. Clairson Indus., L.L.C.*, 492 F.3d 1247, 1262 (11th Cir. 2007). The burden then shifts to the defendant to show that the accommodation would impose undue hardship on the employer. *Id.*

Plaintiff has carried his burden of showing that his requested

accommodation was facially reasonable. *See US Airways, Inc. v. Barnett*, 535 U.S. 391, 401–02 (2002). As discussed above, Mr. Collins's immediate supervisors have all testified that visiting job sites and being physically present in the office are not essential functions of the plans examiner position. (PSAF 51-54.) Thus, while Defendant may find it preferable for employees to be present in the office, it was clearly not a work-related requirement. (*Id.*) Plaintiff's immediate supervisors further testified that they did not have an issue with Mr. Collins working remotely and thought Mr. Collins was doing a great job while working remotely. (PSAF 55.) These facts show that Plaintiff's request for continued remote work was reasonable.

Meanwhile, Defendant has not even attempted to carry its burden of establishing why allowing Mr. Collins to work remotely would cause undue hardship to Defendant. *US Airways, Inc.*, 535 U.S. at 401–02 (2002) (clarifying that to meet this burden of proof, Defendant "must show special (typically case-specific) circumstances that demonstrate undue hardship in the particular circumstances"). When pressed to explain why it was necessary for Mr. Collins to return to the office, Chief McMurray and Chief Labbe both conceded that they were just following orders from above mandating that <u>all</u> fire department employees return to work, regardless of job duties. (PSAF 56.) None of Defendant's witnesses have proffered any testimony whatsoever as to why specifically requiring a plans examiner would cause undue hardship to Dekalb County. Smith testified that she never even asked

Chief Labbe or Chief McMurray how often plan reviewers visited job sites and/or whether arrangements could be made to excuse a plan examiner from visiting jobsites. (Smith Dep. 20:14-23:1.)

Finally, Defendant's suggestion that it offered an alternative reasonable accommodation is entirely disingenuous. The record is clear that Collins already had an assigned office available to him, as did <u>all</u> plan reviewers as of July 2023. **(**Collins Decl. ¶ 38; Collins Dep. 130:18-131:22; Smith Dep. 57:19-58:6; Labbe Dep. 77:8-14, 78:23-79:5; McMurray Dep. 82:4-7, 93:22-97:2; Pruitt Decl. ¶ 10; Price Decl. ¶ 13.) Smith testified that nothing special was done to Collins's assigned office—i.e. it was not retrofitted in any way to address his medical needs.[1] (Smith Dep. 147:19-148:12.) Thus, the record is clear that the "alternative accommodation" allegedly offered to Collins was not an accommodation at all, as it only offered Collins what he and all of the other plan reviewers already had.

For all of these reasons, Plaintiff has proffered sufficient evidence to create a triable issue of failure to accommodate.

### (b) Mr. Collins Has Established a Triable Issue of Discriminatory Discharge

Plaintiff has also established a triable issue of whether he was terminated

---

[1] Even if it had been, it is undisputed that the written offer of accommodation given to Plaintiff did not mention any such special arrangements and only referenced an "office." (DSF 19.)

because of his disability in violation of the ADA.

But-for causation is easily satisfied here as the termination letter specifically references Plaintiff's medical restrictions and request for accommodation as the reason for the termination. Indeed, the letter claims Plaintiff's inability "to resume the essential functions of [his] job . . . which include visiting job sites when necessary" meant "no viable option remains other than termination of your employment." (Doc. 66-1 pp. 30-31.) It is clear from the reasons listed in the termination letter that if Plaintiff had not had disabilities requiring him to work from home, then he would not have been terminated. (*Id.*) Thus, Plaintiff's disabilities was a but-for cause of his termination. *See Bostock v. Clayton Cnty., Georgia,* 590 U.S. 644, 656 (2020) ("a but-for test directs us to change one thing at a time and see if the outcome changes. If it does, we have found a but-for cause.")

The record is also replete with evidence of pretext, as Defendant is utterly unable to proffer a coherent reason supported by evidence as to why Defendant could not accommodate Plaintiff's medical need to work remotely. *See Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981) (holding plaintiff may establish pretext by showing that the employer's proffered explanation is unworthy of credence).

Plaintiff's termination letter states that Plaintiff was terminated for being unable to perform an essential function of his job, namely field visits. (Doc. 66-1 pp. 30-31.) Yet Plaintiff has proffered substantial evidence—including sworn testimony

from Chief McMurray, Chief Labbe, Manager Miller, Supervisor Price, and Lead Pruitt—that conducting field visits was **not** in fact an essential function of his job. (PSAF 52.) When it became abundantly clear during discovery that visiting jobsites was not actually an essential function of a plans examiner's job, Defendant tried to recast its position. Indeed, Defendant now argues in its motion for summary judgment that Plaintiff was terminated because he was unable to perform the allegedly essential functions of physical presence in the office and in-person communication with stakeholders. As discussed *supra*, however, Plaintiff can point to sworn testimony from his immediate supervisors that in-office presence and in-person communication were **not** essential functions of his job either. (PSAF 53-54.)

The clear contradiction between Defendant's proffered reasons and the sworn testimony of key witnesses reveals such "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in Defendant's position as to make it "unworthy of credence." *Holland v. Gee,* 677 F.3d 1047, 1055–56 (11th Cir. 2012); *Combs v. Plantation Patterns,* 106 F.3d 1519, 1537 (11th Cir. 1997); *see also Lewis v. City of Union City, Georgia*, 934 F.3d 1169, 1186 (11th Cir. 2019) (holding jury may infer from contradictions in the record that "[defendant's] proffered reason[] [is] not what actually motivated its conduct."). A jury could reasonably conclude that Defendant is simply "dissembling to cover up a discriminatory purpose," and that its dishonesty is "affirmative evidence of guilt." *See Reeves,* 530

U.S. at 147, 120 S.Ct. 2097.

## B. MR. COLLINS HAS ESTABLISHED A TRIABLE ISSUE OF ADA RETALIATION

Mr. Collins has also proffered sufficient evidence to create a triable issue of ADA retaliation based on his termination.

### 1. Mr. Collins Has Established a *Prima Facie* Case of Retaliation

Defendant does not challenge whether Plaintiff is able to establish a *prima facie* case of retaliation, and it is clear that Plaintiff has done so. Plaintiff engaged in protected activity when he requested reasonable accommodations and suffered an adverse action when he was terminated. *See, e.g., Frazier-White v. Gee*, 818 F.3d 1249, 1258 (11th Cir. 2016). Mr. Collins can easily show that the "the protected activity and the adverse action were not wholly unrelated," as the termination letter specifically references his request for accommodations. (Doc. 66-1 pp. 30-31.)

### 2. Mr. Collins Has Presented a Triable Issue of But-For Causation and Retaliatory Motive

For the same reasons discussed *supra* in Section III.A.(iii)(b), Plaintiff has provided sufficient evidence of but-for causation to sustain a retaliation claim. Indeed, the termination letter specifically states that Plaintiff was terminated because he needed a remote work accommodation. Logically, therefore, if Plaintiff had not requested a remote work accommodation, then he would not have been terminated. *See Bostock,* 590 U.S. at 656.

Also for the same reasons discussed in Section III.A.(iii)(b), Mr. Collins has proffered sufficient evidence that Defendant's proffered reason that Mr. Collins was unable to perform the essential functions of the job is entirely unworthy of credence, as Plaintiff's supervisors have all testified that field visits, in-office presence, and in-person communication were **not** essential functions of Plaintiff's job.

## C. MR. COLLINS HAS ESTABLISHED A TRIABLE ISSUE OF ADA INTERFERENCE

Defendant has further violated the ADA's "interference" provision, which makes it unlawful for employers to "coerce, intimidate, threaten, harass or interfere with" an employee "on account of his or her having exercised or enjoyed . . . any right granted or protected by [the ADA]." 42 U.S.C. § 12203(b); 29 C.F.R. § 1630.12 (adding "harass" to the list of unlawful actions).

"ADA interference and retaliation claims are very similar," though "the former is broader than the latter because it 'protects employees . . . subjected to adverse treatment that is not as severe as retaliation.'" *Brown v. State Farm Mut. Auto. Ins. Co.*, 770 F. Supp. 3d 1355, 1369 (N.D. Ga. 2025). Indeed, there are "certain types of actions which, whether or not they rise to the level of unlawful retaliation, are nevertheless actionable as interference." *Id.* The EEOC has advised that "[c]oercing an individual to relinquish or forgo an accommodation to which he or she is otherwise entitled"; "intimidating an applicant from requesting accommodation"; and "issuing a policy or requirement that purports to limit an

22

employee's rights to invoke ADA protections (e.g., a fixed leave policy that states "no exceptions will be made for any reason")" are all examples of unlawful interference. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, *Enforcement Guidance on Retaliation and Related Issues*, § III (last accessed September 10, 2025, at [https://www.eeoc.gov/laws/guidance/enforcement-guidance-retaliation-and-related-issues](https://www.eeoc.gov/laws/guidance/enforcement-guidance-retaliation-and-related-issues)) (hereinafter referred to as "EEOC Enforcement Guidance").

Ever since Plaintiff submitted his 2023 request for a continued remote work accommodation, Defendant has gone out of its way to interfere with Plaintiff's rights under the ADA. First, Defendant interfered with Plaintiff's ADA rights by making him jump through pointless hoops to exercise his legal rights. Despite the "modest" informational requirements for employees seeking accommodations, *Owens v. Governor's Off. of Student Achievement*, 52 F.4th 1327, 1336 (11th Cir. 2022), Collins had to submit two separate request forms, three supporting medical certifications, and three supporting clarifying letters from his providers before his request was finally deemed complete. (PSAF 45-46; Doc. 61-14, pp. 34-35.) Defendant's excessive requests for more information delayed the ADA interactive process by several months and imposed a heightened documentation requirement on Mr. Collins beyond what the ADA allows. *See, e.g., Owens*, 52 F.4th at 1336 (explaining that the disclosure of "detailed or private information about [a] disability" is not required during the interactive process as detailed information

about a disability; "a disabled employee need only identify a statutory disability and explain generally how a particular accommodation would assist [him]."

Second, Defendant interfered with Plaintiff's ADA rights by trying to bully Plaintiff into abandoning his accommodation request during the drawn-out interactive process. (Collins Decl. ¶¶ 32, 34-36; Collins Dep. 131:15-22, 166:8-168:6; McMurray Dep. 49:9-56:13, 70:15-23, Exs. 3-4;) Chief McMurray publicly scolded Mr. Collins for not returning to in-person work five days a week, and tried to intimidate Mr. Collins and/or coerce him into retracting his outstanding request for accommodation by stating that if the CEO wanted him in the office, then he had no choice but to be in the office. (*Id.*) This court recently held that similar conduct created a triable issue of ADA interference in *Miller-Brown v. RV Behavioral, LLC*, Civ. No. 1:23-CV-04608-ELR (N.D. Ga) (August 19, 2025) (defendant scolded plaintiff for mentioning disabilities and stated her position had "no flexibility").

Third, when Plaintiff stood by his request for accommodations, Defendant coerced Plaintiff into going on FMLA leave by threatening termination. (PSAF 48.) In so doing, Defendant knowingly created an impossible situation for Plaintiff whereby he had to provide proof of his medical restrictions to continue his ADA request, yet simultaneously had to provide proof that he was released to return to work without any restrictions in order to return to work after the FMLA leave. (Smith Dep. 92:15-93:11.) By knowingly manipulating the situation such that Plaintiff could not

return from leave without abandoning his ADA request for accommodations, Defendant interfered with Plaintiff's rights under the ADA.

Fourth, Defendant purported to limit Mr. Collins's right to invoke ADA protections by telling Mr. Collins that remote work was not possible because the CEO and Chief Fullum had ordered <u>everyone</u> in the fire department to return to work in person five days a week, without exception. (PSAF 56; Collins Decl. ¶ 34; Collins Dep. 131:15-22, 166:8-168:6; McMurray Dep. 73:12-19, 103:8-24.) Defendant's de facto policy of curtailing employees' rights under the ADA and requiring everyone—without exception—to return from remote work clearly violates the ADA. *See, e.g., Holly*, 492 F.3d at 1261–63. The EEOC has specifically advised that such blanket rules constitute actionable ADA interference under 42 U.S.C. § 12203(b). *See* EEOC Enforcement Guidance, *supra*.

## IV. CONCLUSION

Mr. Collins has demonstrated the presence of material issues of fact that must be decided by a jury with regard to each of his claims. Accordingly, Defendant's Motion for Summary Judgment must be denied.

Respectfully submitted this 11th day of September, 2025.

**BERGMAR LAW LLC**

*/s/ Nina Maja Bergmar*
Nina Maja Bergmar
Georgia Bar No. 982879
1100 Peachtree St. NE, Ste 200
Atlanta, GA 30309
Tel.: (470) 239-2096
Fax: (470) 339-5502
nmb@bergmarlaw.com

Attorney for Plaintiff

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| **PATRICK MICHAEL COLLINS,** ) | |
| ) | |
| **Plaintiff,** ) | **Case No. 1:24-cv-01252-LMM-CMS** |
| ) | |
| **v.** ) | **JURY TRIAL DEMANDED** |
| ) | |
| **DEKALB COUNTY, GA,** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |

## CERTIFICATE OF SERVICE AND COMPLIANCE

I hereby certify that the foregoing document was prepared using a Times New Roman 14-point font, and that I have on this date served a copy of the within and foregoing by filing a copy of the same with the Clerk of Court using the CM/ECF system, which will automatically send e-mail notification of such filing to all attorneys of record.

Respectfully submitted this 11th day of September, 2025.

**BERGMAR LAW LLC**

s/ *Nina Maja Bergmar*
Nina Maja Bergmar, Esq.