IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| PATRICK MICHAEL COLLINS,<br><br>    Plaintiff,<br><br>v.<br><br>DEKALB COUNTY, GA,<br><br>    Defendant. | Civil Action No.<br><br>1:24-cv-01252-LMM-CMS |

**<u>DEFENDANT'S REPLY BRIEF IN SUPPORT OF<br>MOTION FOR SUMMARY JUDGMENT</u>**

As required by Local Rule 7.1(A)(C), Defendant DEKALB COUNTY, GA submits this reply brief in support of its Motion for Summary Judgment.

**I.　INTRODUCTION**

While the Defendant did what was necessary to make ends meet while keeping staff safe during the COVID-19 pandemic, Defendant's constituents and customers demanded a return to normalcy and the resumption of the Fire Rescue Department's full services. Based on operational and job specific requirements inherent in the plans examiner role, Plaintiff's supervisors in the Fire Rescue Department determined that they could not exempt Plaintiff and the other plans examiners from this return to in-person reporting without the elimination of essential functions of the plans examiner role. Plaintiff, though, was dead-set on continuing to work remotely

with no flexibility and failed to participate in the interactive accommodation process in good faith. In his Response, Plaintiff insists that Defendant denied Plaintiff's requested accommodation for non-job related reasons. But this theory of the case begs the question: what logical or coherent motivation could Defendant have for asking Plaintiff to come back to work in the office other than operational and job specific purposes? Clearly, there was no other reason. Defendant wanted to keep Plaintiff as an employee, but Plaintiff wanted to keep the "semi-retired" status that working from home allowed him. (Doc. 61-6 at 19).

Plaintiff's Response to Defendant's Motion for Summary Judgment fails, for five reasons. First, Plaintiff fails to demonstrate that 100% remote work is a reasonable accommodation under the ADA, and fails to demonstrate that it would not require the elimination of essential functions of the plans examiner role. The declarations of Plaintiff's former co-workers do nothing to establish that physical presence is not an essential function. Second, Plaintiff's strained and factually erroneous reading of his own medical records is insufficient to show that Plaintiff is disabled within the meaning of the ADA. Third, Plaintiff's refusal to consider a legitimate alternative accommodation caused a breakdown in the interactive process, preventing Defendant from making further efforts to seek a reasonable accommodation. Fourth, Plaintiff's retaliation claim is duplicative of his failure to accommodate claim, because the only purported retaliation was failure to provide

4912-0586-6092, v. 2

Plaintiff's requested accommodation. Fifth, and finally, none of Plaintiff's attempts to establish an interference claim pass muster. Accordingly, for all the reasons outlined below, Defendant is entitled to summary judgment as to all of Plaintiff's claims.

## II.  ARGUMENT AND CITATION OF AUTHORITY

### A. **Plaintiff's Requested Accommodation of 100% Remote Work Requires the Elimination of Essential Functions**

Like most jobs, the plans examiner role involves a considerable amount of work that cannot be performed if an employee is confined to 100% work from home. *See* Weber v. BNSF Ry. Co., 989 F.3d 320, 325 (5th Cir. 2021) ("[T]here is a general consensus among courts…that regular work-site attendance is an essential function of most jobs."). As both the job description and the testimony of Plaintiff's supervising Chiefs demonstrate, the plans examiner role involves on-site participation in assessing "field review questions," on-demand customer service, teamwork through collaborative meetings, and cross-department coordination. (Doc. 61-2; Doc. 64 at 22, 39–40, 93; Doc. 65 at 29, 104–05, 105:1-6; Doc. 68 at 40–41). These work functions would be substantially impaired, and in some cases impossible to perform, if a plans examiner was confined to his home. *See* E.E.O.C. v. Ford Motor Co., 782 F.3d 753, 762 (6th Cir. 2015) ("[I]n most jobs, especially those involving teamwork and a high level of interaction, the employer will require regular and predictable on-site attendance from all employees."); *see also* Waldrop v.

Gwinnett Cnty. Sch. Dist., 2023 WL 9688352, at *7 (N.D. Ga. 2023), report and recommendation adopted, 2024 WL 1333041 (N.D. Ga. Mar. 2024). Given the realities of Plaintiff's job, any finding that the ADA mandates the specific accommodation of 100% remote work (which is the only accommodation Plaintiff ever requested) would be a major departure from well-settled precedent articulating the foundational and obvious need to have employees available to attend work in-person. *See* Kiesel v. Delta Air Lines, Inc., 2024 WL 5717552, at *8 (N.D. Ga. 2024), *report and recommendation adopted*, 2024 WL 5717940 (N.D. Ga. 2024); *see also* Morris-Huse v. GEICO, 748 Fed. Appx. 264, 266 (11th Cir. 2018); Garrison v. City of Tallahassee, 664 Fed. Appx. 823, 826 (11th Cir. 2016); Abram v. Fulton Cnty. Gov't, 598 Fed. Appx. 672, 677–78 (11th Cir. 2015).

Plaintiff's Response fails to engage with any of the precedent cited in Defendant's Motion for Summary Judgment. Instead, Plaintiff claims that "the efforts to bring [Plaintiff] back to work had nothing to do with his actual job functions" and was instead a blanket directive handed down from the County's CEO. (Doc. 71 at 15–16). But Chief Fullum specifically testified that "each individual department, each individual function, had to make these decisions about what was necessary" when deciding whether to require in-person work, and that the CEO's instruction "wasn't a blanket statement that said everybody come back to work." (Doc. 68 at 28). Furthermore, Chief Fullum expressly testified that his decision to

- 4 -

4912-0586-6092, v. 2

return his department to in-person work was motivated by the "public…saying you need to come back to work because they wanted the services" (Doc. 68 at 27). Plaintiff attempts to bend Chief Labbe and Chief McMurray's testimony to fit his version of events, but his efforts come up short. (PSAF, ¶ 56). Chief Labbe specifically denied any knowledge regarding the existence of a directive from anyone other than Chief Fullum. (Doc. 64 at 69–70). Chief Labbe also testified that he was asked about the nature of Plaintiff's job functions and his expectations as a supervisor regarding meeting attendance during the interactive process. Id. at 89. Similarly, Chief McMurray identified the directive ending remote work as a decision made by Chief Fullum. (Doc. 65 at 20:3–7, 71:3–7). Chief McMurray also specifically reserved his testimony regarding the CEOs involvement based on a lack of personal knowledge, saying that he could not confidently testify "without seeing the document." (Doc. 65 at 18:24–25, 19:24 – 25). Clearly, Chief Fullum's decision to return his staff to in-person work was based on legitimate operational concerns, and the denial of Plaintiff's specific request for 100% remote work involved a specific assessment of Plaintiff's job responsibilities.

Finally, Plaintiff asserts that his supervisors uniformly testified that physical presence both in the office and at work sites are not essential functions of the plans examiner role. (Doc. 71 at 15). This argument errs in two key respects. First, Chief McMurray and Chief Labbe each testified at length about the importance of having

plans examiners available to appear at site inspections to assist with "field review questions." (Doc. 64 at 39–40; Doc. 65. at 29; 105–06). Plaintiff's attempts to cherry-pick specific statements from Chief Labbe and Chief McMurray's deposition fall short when those statements are read in context. Chief Labbe articulated that plans examiners go out to site visits "when it's appropriate," and gave specific examples of recent instances in which a plans examiner was required to meet with a developer and an architect at a site. (Doc. 64 at 39–40). And Chief McMurray similarly stated that plans examiner attendance at site visits offered plans examiners and inspectors the opportunity to get "cross-training and understanding" about their inter-related job responsibilities, while also reducing the amount of "stoppages or problems" caused by miscommunication between the two job responsibilities. (Doc. 65 at 62).

Second, Plaintiff's attempts to rely on eleventh hour declarations prepared by Plaintiff's former co-workers regarding the nature of Plaintiff's job responsibilities are belied by record evidence. (Docs. 70-2, 70-3, 70-4). These declarations' assertions that attendance at site visits was "very rare" are impossible to square with the clear documentary evidence of at least 13 different instances in which Plaintiff requested and attended numerous site visits during his employment. (Doc. 61-9). It further strains belief that these co-workers now feign ignorance of these visits because all three were included in the correspondence in which Plaintiff requested

or confirmed attendance at site visits, and these co-workers even attended several site visits themselves. *See e.g.* id. at 5. Furthermore, because none of Plaintiff's former co-workers served at the Chief level, they cannot testify as supervisors regarding the potential adverse impacts that would occur if plan examiners failed to participate in Defendant's weekly and monthly in-person team meetings headed by the Chiefs. The unrebutted testimony is that plans examiners, including Plaintiff, were attending these meetings in-person and actively participating. *See* Doc. 65 at 108–09; *see also* Doc. 61-18 at 5 (noting Plaintiff was attending weekly and monthly meetings a "FR HQ").

## B. <u>Plaintiff Fails to Provide Any Cogent Evidence of a Disability That Imposes Any Functional Limitation on Plaintiff</u>

Plaintiff's smoke and mirrors attempt to establish that he suffers from a real disability that substantially limits his major life activities is inadequate to stave off summary judgment. What started as a claim based on ADHD and "early onset dementia," (Doc. 1, ¶ 13), has now wandered far afield to include allegations of epilepsy, seizures, and strokes[1], none of which were identified by Plaintiff when he testified regarding the nature of his condition. (Doc. 63 at 34–35). What is clear from a close reading of Dr. Cantor's 2023 assessments (which occurred subsequent to any

---

[1] Plaintiff asserts he was diagnosed with "transient cerebral ischemic attack," which is often referred to as a "ministroke." <u>Transient ischemic attack (TIA)</u>, MAYO CLINIC, https://www.mayoclinic.org/diseases-conditions/transient-ischemic-attack/symptoms-causes/syc-20355679 (last visited Sept. 25, 2025).

diagnosis made by Dr. Schiff), is that Plaintiff suffered from no real functional, cognitive limitations at the time he was seeking an accommodation from Defendant. *See e.g.* Doc. 61-6 at 21 ("[W]ith other patients, of course, that I've seen that I diagnosed as having true early stage dementia, they do have impairments. I mean I can document where their weaknesses and performance problems are. **You aren't one of those people.**") (emphasis added).

Plaintiff tries to salvage a qualifying disability from Dr. Cantor's analysis by asserting that "neurometric qEEG results put [Plaintiff] at 2nd percentile for visual memory." (Do. 71 at 4, 15). This is factually untrue. This 2nd percentile statistic does not come from the "neurometric qEEG" (i.e. Plaintiff's "brain scan"), but instead from "computerized testing," also referred to as the "CNS Vital Signs" test. (Doc. 61-6 at 5; Doc. 61-14 at 10). Dr. Cantor expressly admonished Plaintiff that "I don't put a lot of stock in the computerized test measurements." (Doc. 61-6 at 5). In fact, when reviewing Plaintiff's visual memory scores on the Wechsler Memory Scales (which Dr. Cantor identified as "gold standard for assessing memory functioning") Plaintiff was deemed to be in the 63rd percentile of visual memory. (Doc. 61-6 at 5; Doc. 61-14 at 14). Dr. Cantor also assured Plaintiff on multiple occasions that his visual memory was "not in the impaired range." (Doc. 61-6 at 4; *see also* id. at 3 ("The only reason you[r] composite memory score was a little on

the low average is that your visual memory was poor on this particular instrument. I don't put a lot of stock on this instrument, this computerized testing….")).

Beyond these plainly inadequate sources of evidence, Plaintiff relies solely on his own self-reporting about what "*he perceived* as cognitive decline." (Doc. 71 at 2) (emphasis added). But a plaintiff cannot survive summary judgment by citing to "self-reporting of symptoms…without other corroborating evidence." <u>Eisenberg v. Permanente Med. Grp.</u>, 855 F.Supp.2d 1002, 1013 (N.D. Cal. 2012). This is especially true in this case, considering the substantial contradictory medical evidence provided in Dr. Cantor's evaluation.

### C. **Defendant Offered a Legitimate Accommodation Consistent with Plaintiff's Alleged Needs for a Distraction Free Environment**

Plaintiff claims that the alternative accommodation of a private, secluded office was not an accommodation at all, because "it was not retrofitted in any way to address his medical needs." (Doc. 71 at 18). But Plaintiff cites no competent summary judgment evidence to support a conclusion that the offered accommodation was not responsive to Plaintiff's alleged needs. Chief McMurray testified about the various aspects of this office, purpose-built for Plaintiff, that made it responsive to Plaintiff's concerns regarding outside distractions. (Doc. 65 at 112; SMF, ¶ 20). Plaintiff's attempts to dispute this point by citing the declaration of Price and Pruitt. But Price concedes that Plaintiff (and other plan reviewers) were receiving "new offices," and neither Price nor Pruitt offer any testimony

contradicting Chief McMurray's characterization as to the attributes of the new office prepared for Plaintiff. (Doc. 70-3, ¶ 13; Doc. 70-4, ¶ 10). Of course, Plaintiff himself cannot testify regarding the nature of the new office offered to him, because he never bothered to inspect this office. (SMF, ¶ 24; RSMF, ¶ 24). The fact that other plan reviewers happened to be receiving new offices did not alleviate Plaintiff from his burden of participating in the interactive process by inspecting the office being specifically offered to him, to determine whether it complied with his purported special needs. Plaintiff's failure to even consider this alternative accommodation caused a breakdown in the process, precluding Plaintiff from succeeding on any failure to accommodate claim. Stewart v. Happy Herman's Cheshire Bridge, Inc., 117 F.3d 1278, 1287 (11th Cir. 1997).

### D. Plaintiff's Retaliation Claim is Duplicative of His Failure to Accommodate Claim, and Fails for the Same Reasons

When a plaintiff's sole basis for claiming ADA retaliation is that the employer denied plaintiff's requested accommodation, such a claim is redundant of the failure to accommodate claim. *See* Lucas v. W.W. Grainger, Inc., 257 F.3d 1249, 1261 (11th Cir. 2001) ("Lucas also contends that Grainger took adverse action against him by failing to reasonably accommodate him, by refusing to maintain him on light duty work, and by failing to engage him in an interactive process. But this contention merely reclothes Lucas' ADA discrimination claim, which we have already rejected, and it fares no better in this garb."). Here, Plaintiff's retaliation claim merely

- 10 -

4912-0586-6092, v. 2

reasserts Plaintiff's contentions that Defendant should have accommodated Plaintiff when he demanded 100% remote work. Because Plaintiff has presented no evidence of any retaliation besides Defendant's failure to provide the requested accommodation of 100% remote work, Plaintiff's retaliation claim must fail for all the same reasons outlined above regarding his failure to accommodate claim.

### E. Defendant's Attempts to Engage in the Interactive Process Were Not "Interference" with Plaintiff's ADA Rights

Plaintiff claims that Dominique Grant's attempts to obtain legible and cognizable information from Paige McBryar regarding the nature of Plaintiff's alleged limitations amounted to ADA interference, because such communications were "pointless hoops" that Plaintiff was required to jump through. (Doc. 71 at 23). Essentially, Plaintiff is asking this Court to find that employers are legally prohibited from seeking clarifying information from an employee's medical providers during the accommodation process. This would be inconsistent with caselaw in this Circuit indicating that "it is reasonable that the employee inform [his] employer how the accommodation [he] seeks will address [his] limitations." Owens v. Governor's Off. of Student Achievement, 52 F.4th 1327, 1336 (11th Cir. 2022).

Plaintiff also makes the bizarre assertion that Grant's correspondence with Monica Smith somehow demonstrates a malicious, hidden desire to deny Plaintiff's accommodation request at the outset. (Doc. 70-6 at 2; Doc. 71 at 8–9). This communication shows exactly the opposite. Grant specifically informed Smith that

he intended to "go through the Interactive process with" Plaintiff, and intended to try to identify specific restrictions that were imposed by Plaintiff's alleged disability. (Doc. 70-6 at 2). Grant's suggestion that "these things workout them selves [*sic*]" is nothing more than an indication that the interactive process generally produces an accommodation that is agreeable to both the employee and the employer. Plaintiff's strained and unsupported conclusion about the significance of this communication demonstrates Plaintiff's "grant-accommodations-first, ask-questions-never" attitude.

This is especially so when taken in the context of Paige McBryar's communications, because she repeatedly failed to provide the information that Grant requested. (Doc. 61-22 at 4–13). Plaintiff appears to believe that employers should just accept a provider's conclusory assertions about what accommodation should be granted, rather than seeking to understand the limitations involved with an employee's alleged disability. *See* Owens, 52 F.4th at 1336 ("'[V]ague or conclusory statements revealing an unspecified incapacity are not sufficient to put an employer on notice' of its accommodation duties.") (citation omitted). Any finding that Grant's communications amounted to "interference" with Plaintiff's ADA rights would dramatically limit employers' ability to engage in good faith with their employees and their employees' medical providers when seeking to craft a suitable accommodation for the employee.

### F. Terminating an Employee that Exhausts Their FMLA Leave and Refuses to Return to Work is Not ADA Interference

Plaintiff asserts that Defendant interfered with Plaintiff's ADA rights by requiring Plaintiff to provide a medical clearance at the end of his FMLA leave, indicating that Plaintiff was capable of performing the essential functions of the plans examiner role. (Doc. 71 at 24–25). But various courts in this Circuit have held that "[a]n employer does not violate the ADA by terminating an employee who fails to return to work after expiration of her FMLA leave or *otherwise terminating an employee for failing to submit a medical release upon returning to work*." Kearse v. Mayor & Aldermen of City of Savannah, Georgia, 2019 WL 6247669, at *9 (S.D. Ga. 2019) (emphasis added); *see also* Diaz v. Transatlantic Bank, 367 Fed. Appx, 93, 98 (11th Cir. 2010) (affirming summary judgment on an ADA claim in favor of an employer who terminated an employee for failing to provide medical clearance following FMLA leave, in-part, because Plaintiff "did not raise a genuine issue of material fact to show that [defendant's] legitimate, nondiscriminatory reason for firing her was a pretext").

Furthermore, any contention that Plaintiff was "coerced…into going on FMLA leave" is not supported by the record. (Doc. 71 at 24). Plaintiff was merely instructed regarding his in-person reporting requirements (which were applicable to all plans examiners), and told that he would need to file for FMLA leave if he used more than 40 hours of consecutive sick leave. (Doc. 65 at 77–78; Doc. 66 at 85–86).

These instructions were standard for all of Defendant's employees, and do not provide any evidence that Plaintiff was threatened with termination for exercising his ADA rights.

### G. <u>Chief McMurray's Requests that Plaintiff Either Report for Work or Take Leave During the Pendency of the Accommodation Request is Not Interference</u>

Plaintiff lastly attempts to substantiate his interference claim by pointing to a conversation he had with Chief McMurray, in which Chief McMurray reminded Plaintiff about his in-person reporting requirements that remained in effect until Plaintiff's accommodation was approved through the interactive process. (Doc. 71 at 24). But whatever tone was struck during this conversation, this single conversation is clearly insufficient to rise to the level of "coerce, intimidate, threaten, or interfere." 42 U.S.C.A. § 12203(b). Indeed, to support an interference claim, Plaintiff must demonstrate Defendant engaged in "conduct that is so severe or pervasive that it will have the effect of causing a protected person to abandon the exercise of his or her [ADA] rights." <u>Mosley v. AM/NS Calvert, LLC</u>, 2022 WL 843773, at *9 (S.D. Ala. 2022) (alteration in original). We know for certain that this conversation did not rise to the level of interference because it did not, in reality, do anything to temper or mollify Plaintiff's attempts to obtain a 100% remote work accommodation. *See* <u>id.</u> at *9 ("[T]he described conduct fails to meet the level of severity that would cause a reasonable person to abandon her ADA rights…[T]he

Court notes that Mosley did not abandon her continued requests for accommodation."). Indeed, following his conversation with Chief McMurray on May 16, 2023, Plaintiff continued seeking medical records from both Dr. Cantor and Paige McBryar, and continued issuing demands for full time remote work up until his termination in October of 2023.

## III.   CONCLUSION

For all the above stated reasons, Defendant respectfully requests that this Court enter summary judgment in Defendant's favor, and dismiss all of Plaintiff's claims with prejudice.

This 25th day of September, 2025.

Respectfully submitted,

**CRUSER, MITCHELL, NOVITZ, SANCHEZ, GASTON & ZIMET, LLP**

*/s/ Michael D., Hoffer*
Michael D. Hoffer
Georgia Bar No. 359493
Email:  mhoffer@cmlawfirm.com
Direct Dial: (404) 737-8443

Meridian II, Suite 2000
275 Scientific Drive
Peachtree Corners, GA 30092

*(Attorney for Defendant)*

# CERTIFICATE OF COMPLIANCE WITH L.R. 7.1

The undersigned attests that this document was prepared in Times New Roman, 14-point font that complies with this Court's Rules.

This 25th day of September, 2025.

                                          **Cruser, Mitchell, Novitz, Sanchez, Gaston & Zimet, LLP**

                                          */s/ Michael D. Hoffer*
                                          Michael D. Hoffer
                                          Georgia Bar No. 359493

# CERTIFICATE OF SERVICE

I certify that I electronically filed the foregoing *STATEMENT OF MATERIAL FACTS* with the Clerk of Court using the CM/ECF system which will automatically send email notification to all counsel of record.

This 25th day of September, 2025.

**Cruser, Mitchell, Novitz, Sanchez, Gaston & Zimet, LLP**

*/s/ Michael D. Hoffer*
Michael D. Hoffer
Georgia Bar No. 359493